**UNITED STATES of America, Plaintiff,**

v.

**Lucienne D'Hotelle de BENITEZ REXACH et al., Defendants.**

**Civ. No. 531–64.**

United States District Court,
D. Puerto Rico.

Sept. 24, 1975.

As Amended April 5, 1976.

U. S. Atty. Julio Morales Sánchez, Asst. U. S. Atty. José A. Anglada, San Juan, P. R., John J. McCarthy, Trial Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

René Benítez, Walter L. Newsom, Brown, Newsom & Córdova, San Juan, P. R., for defendants.

## OPINION

TORRUELLA, District Judge.

This case is one more chapter in a series of prior actions before this Court involving attempts to recover income taxes allegedly due to the Government of the United States.[1]

This Court has jurisdiction over the subject matter of this controversy by virtue of Sections 7401, 7402 and 7403 of the Internal Revenue Code of 1954 and Sections 1340 and 1345 of Title 28 of the United States Code.

Defendant Lucienne D'Hotelle de Benítez Rexach, hereinafter referred to as Lucienne, was born in France on January 15, 1909. She married Defendant Félix Benítez Rexach, hereinafter referred to as Benítez Rexach, in 1928. Thereafter Lucienne lived in Puerto Rico commencing in 1938 and became a naturalized citizen of the United States on December 7, 1942. As it appears from the finding of facts in the case of *U. S. v. Benítez Rexach,* 185 F.Supp. 465, in 1944 Lucienne left for the Dominican Republic with her husband. From the facts in the above case we can infer that she resided in the Dominican Republic from 1944 to November 9, 1946 and then she travelled to France where she resided until May 20, 1952.

A United States passport was issued to Lucienne on November 10, 1947 by the American Embassy in Paris, France.

On February 11, 1952 Lucienne filed an application for another passport renewal at the United States Consulate in Nice, France. This request was denied and a Certificate of Loss of Nationality was issued and signed by the American Vice Consul in Nice on May 21, 1952. The Vice Consul determined that Lucienne being a naturalized citizen, she had violated Section 404, Chapter IV, of the Nationality Act of 1940[2] by living and residing in her domicile of origin for more than three years, and thus effectively loosing her citizenship as of November 9, 1949. This Certificate was approved by the Department of State on December 23, 1952. A notification of the loss of nationality was filed at the United States District Court for Puerto Rico on March 5, 1953. Lucienne's passport was taken at Nice, cancelled, and never returned to her.

Meanwhile, on January 2, 1952 a decree of privileged naturalization was issued in her favor by the Dominican Government, under the provisions of Dominican Republic Law Number 1633.[3] Thereafter on September 4, 1956 a Dominican diplomatic passport was issued in her name and Lucienne travelled extensively with this passport. On January 20, 1962 the Dominican Government cancelled her citizenship and on June 5, 1962 a French passport was issued to her.

On May 18, 1964 the case of *Schneider v. Rusk*[4] was decided by the Supreme Court of the United States. Therein, the Court held that Sec. 352(a)(1)[5] of the Immigration

---

1. See *United States v. Benítez Rexach et al.,* 185 F.Supp. 465 (D.C.P.R.1960); *United States v. Benítez Rexach et al.,* 200 F.Supp. 494 (D.C. P.R.1961); *United States v. Benítez Rexach,* 41 F.R.D. 180 (D.C.P.R.1966); *United States v. Benítez Rexach,* Civil Number 67–64, D.C., 331 F.Supp. 524.

2. Sec. 404 of the Nationality Act of 1940, 8 U.S.C. § 801 et seq. provided in substance that a naturalized citizen would forfeit his citizenship if he resided in his domicile of origin for 3 years. See *U. S. v. Karahalias,* 205 F.2d 331 (C.A.2, 1953). Sec. 404 was repealed and this area was covered similarly by Sec. 1484(a) of the Immigration and Nationality Act of 1952.

See 8 U.S.C.A. Sec. 804, Historical Note, Page 44.

3. Lucienne became a Dominican citizen under the provisions of Chapter IV of the above mentioned law, which allowed the President of the Republic to invest or confer by decree Dominican citizenship upon those aliens who deserved such an investiture without the usual requirements of Dominican Law.

4. 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964).

5. See footnote 2, this section is similar to Section 404 of the Nationality Act of 1940 under which Lucienne lost her citizenship. Thus, it

and Nationality Act of 1952 was unconstitutional since "living abroad, whether the citizen be naturalized or native born, is no badge of lack of allegiance and in no way evidences a voluntary renunciation of nationality and allegiance." It was stipulated by the parties in this case that from December 23, 1952 up to 1964 no steps were taken by Lucienne to contest her nationality or to affirm her renunciation thereof.

On August 13, 1964 a delegate of the Commissioner of Internal Revenue pursuant to Sec. 6861 of the Internal Revenue Code of 1954, appearing at 26 U.S.C. Sec. 6861(a), made a jeopardy assessment for the sum of $9,065,036.93 against Lucienne for calendar years 1944 through 1950, based on assessed tax deficiencies and interests to the date of assessment.[6] Notice and demand for payment was sent to Lucienne on August 13, 1964. On June 29, 1964 a similar assessment was made for the amount of $12,515,151.89 for fiscal year 1951 through 1958 and a delinquency penalty for 1951 and 1952. Notice and demand for payment were made to Lucienne on June 29, 1964. However, the parties stipulated that all delinquencies or other penalties referred to on the deficiencies were withdrawn.

It should be noted that the above tax assessment periods were based upon one half of the income that Defendant Benítez Rexach earned in the Dominican Republic during said periods and upon the contention that Lucienne had a vested interest over said one half of Defendant Benítez Rexach's income in the Dominican Republic under the community property law of the Dominican Republic. See U. S. v. Benítez

Rexach, 185 F.Supp. 465, D.C.P.R., 1960. Said taxable income was derived from the employment of capital and services by Benítez Rexach in the Dominican Republic.

On January 12, 1965 the United States Department of State sent a letter to an attorney representing Lucienne in the matter of citizenship, informing her that her expatriation from November 9, 1949 was automatically voided due to Schneider v. Rusk, supra. Lucienne answered on January 29, 1965 stating that after her citizenship was revoked she had accepted the decision without protest and that thereafter she had never considered herself a citizen of the United States. She cited in said letter the case of U. S. v. Benítez Rexach, 185 F.Supp. 465, D.C.P.R., 1960, as being dispositive of the question.

The complaint in this case was filed on November 12, 1964. Lucienne died on January 18, 1968.

The tax regulations of the United States generally provide that citizens of the United States[7] are liable to pay income tax even if they are not residents of the United States and own no assets or receive no income within the United States.[8] See 26 CFR 1.1–1(a)(b), P–H 1975 Fed.Taxes Sec. 3423; Cook v. Tait, 265 U.S. 47, 44 S.Ct. 444, 68 L.Ed. 895 (1924); U. S. v. Benítez Rexach, 185 F.Supp. 465 (D.C.P.R.1960). A citizen is defined by the regulations as a person born or naturalized in the United States and who is subject to its jurisdiction. Such a definition must be made under the Immigration and Naturalization Act of 1954. See P–H 1975 Fed.Taxes Sec. 3424.

follows that the constitutional rule expressed in Schneider is also applicable to any loss of nationality under Section 352.

6. Under 26 U.S.C. Sec. 6861 such an assessment may be made if the collection of taxes would be jeopardized by delay. We are not here concerned with a statute of limitations situation by reason of the fact that Lucienne never filed tax returns. See 26 U.S.C. § 6501(c)(3).

7. In case of non-resident aliens or corporations the tax is essentially in rem or in other words

against the income earned in or received from sources within the United States. Resident aliens are taxed the same as citizens of the United States. See 26 CFR 1.1–1(a); 26 U.S.C.A. §§ 871(b) and 877(b); Mertens, Law of Federal Income Taxation, Volume 1, Chapter 1, Sec. 1.06, Page 12 (1974). However, we do not have these factual situations in this case.

8. Except for the exclusion found in 26 U.S.C.A. Sec. 933, which is not at issue according to the stipulation signed by the parties in this case.

Thus we must first look at the effect, if any, of *Schneider v. Rusk,* supra, upon Lucienne's citizenship. In this respect we must determine whether for the purpose of this case, *Schneider* should be applied retroactively in such manner as to result in the voiding of Lucienne's loss of citizenship and to make her responsible for the payment of the assessed taxes from November 9, 1949 onwards.

In the landmark decision of *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Supreme Court established the criteria for determining whether new constitutional rulings in both criminal and civil litigation should be applied prospectively or retrospectively. While deciding that the Constitution neither prohibits nor requires retroactive effect to its decisions, and that no distinction exists between civil and criminal cases, the Court set forth on page 629, 85 S.Ct. on page 1738, 14 L.Ed.2d on page 608 that:

> "Once the premise is accepted that we are neither required to apply, nor prohibited from applying, a decision retrospectively, *we must then weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.*" (Emphasis added).

In subsequent analysis of the *Linkletter* decision, the Circuit Court for the 9th Circuit in the case of *Simpson v. Union Oil Company of California,* 411 F.2d 897 (CA 9, 1969) expounded the principle that has since been followed in determining the retrospective effect of rulings in civil litigation. The Court states at Page 903, that:

> "The major consideration [in civil cases] is—did a party to the present litigation rely on a rule of law which has now been changed, so that it would be inequitable to apply the new rule to such party." [9]

In other decisions the Supreme Court has indicated that a balancing of the equities must be conducted before a civil case may be applied retroactively. In the case of *Chicot County Dist. v. Bank,* 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940), the Court was confronted with determining whether having found that an Act is unconstitutional is by itself an automatic conclusion that said act was not a law, and that it was inoperative and conferred no rights or imposed no duties. The Court states in page 374, 60 S.Ct. in page 318, 84 L.Ed. in page 332 that:

> "The actual existence of a statute, prior to such a determination [of unconstitutionality], is an operative fact and may have consequences which cannot justly be ignored. *The past cannot always be erased by a new judicial declaration.*
>
> . . . . .
>
> These questions are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified." [10] (Emphasis supplied).

---

**9.** It should be noted that the above decision was reversed as to the application of the "equity rule" to the petitioner in that case. See *Simpson v. Union Oil Co.,* 396 U.S. 13, 90 S.Ct. 30, 24 L.Ed.2d 13 (1969). However, no alteration was made by the Supreme Court with respect to the interpretation of the Court of Appeals as to the application of the *Linkletter* case to civil litigation. To the contrary, the Supreme Court seems to adopt said interpretation by reserving ". . . the question whether, when all the facts are known, there may be any equities that would warrant only prospective application . . . "

**10.** In the case of *Hanover Shoe Inc. v. United Shoe Mach.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), in page 496, 88 S.Ct. in page 2233, 20 L.Ed.2d in page 1243 the Court confronts the same issue before us without making an adjudication of it, to wit: "The theory of the Court of Appeals seems to have been that when a party has significantly relied upon a clear and established doctrine, and the retrospective application of a newly declared doctrine would upset that justifiable reliance to his substantial injury, consideration of justice and fairness require that the new rule apply prospectively only."

In another decision, *Cipriano v. City of Houma et al.,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), the Court set forth in page 706, 89 S.Ct. in page 1900, 23 L.Ed.2d in page 652 that:

> "*Where a decision of this Court could produce substantial inequitable results if applied retroactively,* there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of non retroactivity." (Emphasis added). (Citations omitted).

In the recent decision of *Chevron Oil Co., v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Supreme Court set forth in page 106, 92 S.Ct. in page 355, 30 L.Ed.2d in page 306, the standards to be taken into consideration when determining the issue of nonretroactivity by expressing that:

> "In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied[11], or by deciding an issue of first impression whose resolution was not clearly foreshadowed.[12] Second, it has been stressed that 'we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.'[13] Finally, we have weighed the inequity imposed by retroactive application, for '[w]here a decision of this Court could produce substantial ineq-

uitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity.' "[14]

The Court further emphasizes at page 108, 92 S.Ct. at page 356, 30 L.Ed.2d at page 306 that: "Yet, retroactive application of the Louisiana statute of limitations[15] to this case would deprive the respondent of any remedy whatsoever on the basis of *superseding legal doctrine that was quite unforeseeable.*"[16] (Emphasis added).

Finally, in *Lemon v. Kurtzman,* 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973), the Supreme Court again balanced the equities in deciding not to apply a decision retroactively in a civil case. The Court set forth in page 201, 93 S.Ct. in page 1469, 36 L.Ed.2d in page 162 that:

> "In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots."

█ In resuming the above we can say, that the general principles that govern retroactivity should be applied on a case by case basis taking into consideration such factors as the reliance placed by the parties on the legislation in question, the balancing of the equities of the particular situation, and the foreseeability or lack thereof, that the legal doctrine or statute in question would be declared unconstitutional.

█ Measured against these standards we are of the opinion that the present circumstances do not merit the consequences

---

11. *Hanover Shoe Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 496, 88 S.Ct. 2224, 2233, 20 L.Ed.2d 1231, 1243 (1968).

12. *Allen v. State Board of Election,* 393 U.S. 544, 572, 89 S.Ct. 817, 835, 22 L.Ed.2d 1, 21 (1969).

13. *Linkletter v. Walker,* supra.

14. *Cipriano v. City of Houma,* 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647, 652 (1968).

15. Although this case deals with the retroactivity of a statute, not of a court decision, the rule set forth seems to apply to both situations.

16. See also, *Jordan v. Weaver,* 472 F.2d 985 (CA 7, 1973), reversed on other grounds; *Nelson v. Schmidt,* 373 F.Supp. 705 (W.D.Wis., 1973).

that would follow from retroactive application of *Schneider v. Rusk,* supra, to Lucienne for purposes of determining her income tax liability. Most assuredly not only did she rely on the revocation of her citizenship as expressed to her by the United States Consul in Nice, as is demonstrated by her obtaining the passport of France thereafter, but in fact this very Court also relied on said action in making related findings in other Benitez Rexach cases previously cited herein. This reliance speaks for itself as regard any possible contention that Lucienne could have foreseen that the relevant section of the Nationality Act would be declared unconstitutional. Considering that it was, first of all, a presumably valid statute of Congress which placed Lucienne outside of the protection of the citizenship of the United States, and that secondly, it was the Executive Branch that proceeded to strip her of these important benefits, it would be tantamount to compounding these legal absurdities to have the Judiciary carry the fiction that the Constitution is always as interpreted by the Supreme Court to the logical but insensible conclusion propounded by the Government in this action. The equities against retroactive application of *Schneider v. Rusk,* supra, lay with Lucienne, and we so hold.[17]

We thus conclude that for purposes of this case, Lucienne was not a citizen of United States after November 9, 1949, and thus not subject to taxation on her half of the income of Benitez Rexach earned outside of the jurisdiction of the United States.

We are now required to focus on the period encompassing 1944 through November 9, 1949, and in this respect, we must first deal with the applicability of the doctrines of laches, res judicata or collateral estoppel and the contention of Defendants that the prior suits involving various of the present Defendants bring these doctrines into play herein.

■ To begin with it is clear that in a non-equity case,[18] the United States is not subject to the defense of laches when it is suing to enforce public rights and while acting in its governmental capacity. *U. S. v. Sumnerlin,* 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940), *U. S. v. Samson Management Corp.,* 64 F.R.D. 83 (ND, GA, 1974). In the present case the Government is enforcing such a public claim.

The doctrines of res judicata and collateral estoppel are related but different precepts.

■ Under the doctrine of res judicata a judgment on the merits in a prior suit involving the same parties or their privies bars a subsequent suit based upon the same cause of action. See *Lawlor v. National Screen Service,* 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955).

In the recent case of *Sea Land Service, Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), the Supreme Court defined the doctrine of res judicata as operating to bar:

. . . "repetitious suits involving the same cause of action. [The bar] rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations. The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.' The judgment puts an end to the cause of action, which

---

**17.** We might add that even were *Schneider* to apply, the facts of this case strongly indicate a voluntary renunciation by Lucienne to her American citizenship after being notified of her loss of nationality in 1952. When her Dominican citizenship was revoked in 1962, she was issued a French passport, her citizenship of birth, and used the said citizenship until her death 12 years later.

**18.** In equitable cases the doctrine of laches may apply as against the United States. *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946).

cannot again be brought into litigation between the parties upon any ground whatever, absent fraud, or some other factor invalidating the judgement." (Citations omitted).

The doctrine of collateral estoppel is applied in the following situation:

"[W]here the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action, not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action." See *Cream Top Creamery v. Dean Milk Co.,* 383 F.2d 358 (CA 6, 1967).

The difference between the two doctrines was stated by the Supreme Court as follows:

"The basic distinction between the doctrines of res judicata and collateral estoppel, as those terms are used in this case, has frequently been emphasized. Thus, under the doctrine of res judicata, a judgment 'on the merits' in a prior suit involving the same parties or their privies bars a second suit based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, such a judgment precludes relitigation of issues actually litigated and determined in the prior suit, regardless of whether it was based on the same cause of action as the second suit." See, *Lawlor v. National Screen Service,* 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955).

An analysis of the prior *Benítez Rexach* cases leads us to conclude that neither of these doctrines are applicable to the Government's cause of action for the collec-

tion of taxes during the period of 1944 through November, 1949.

In the case of *United States v. Benítez Rexach,* 185 F.Supp. 465 (D.C.P.R.1960) Lucienne was not included as a party. Benítez Rexach raised the question of her citizenship as a defense. The rights of Benítez Rexach were adjudicated and no cause of action was brought or litigated against Lucienne for the collection of taxes during the 1944 through 1949 period. In *United States v. Benítez Rexach,* 200 F.Supp. 494 (D.C. P.R., 1961); *United States v. Benítez Rexach,* 41 F.R.D. 180 (D.C.P.R., 1966), and *United States v. Benítez Rexach,* Civil Number 67–64, D.C., 331 F.Supp. 524, Lucienne is included as a party with interest on the properties of Benítez Rexach. But again, no adjudication was made by the Court as to her tax responsibility for the above mentioned period.

There is thus no identity between the cause of action in this case and that of the other Benítez Rexach cases, nor has there been any adjudication on the merits, or otherwise, of Lucienne's tax responsibility for fiscal years 1944 through 1949. Therefore, neither res judicata nor collateral estoppel bar recovery for said period.

Defendants next allege that the Government is estopped from collecting from Lucienne during the fiscal years 1944–1949.

The doctrine of estoppel has been defined by the courts as " . . . where one party makes by its words or actions a false representation of fact and the other party reasonably relies on the misrepresentation and is prejudiced thereby." See *Allied Steel Construction Co. v. Employers Casualty Co.,* 422 F.2d 1369 (CA 10, 1970); *Aetna Insurance Co. v. Glens Falls Insurance Co.,* 453 F.2d 687 (CA 5, 1972).

The Courts have considered the following elements as necessary, for the doctrine of estoppel to be applicable:

(1) False representation or concealment of material facts.

(2) False representation made with knowledge of the facts.

(3) The party to whom it was made must have been ignorant of the truth of the matter.

(4) False representation made with interest or intention that the other party acts upon it.

See *American Security and Trust Company v. Fletcher,* 490 F.2d 481 (CA 4, 1974), cert. denied, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1975); *California State Board of Equalization v. Coast Radio Products,* 228 F.2d 520 (CA 9, 1955).

■ The doctrine of estoppel must be applied with great caution to the Government, although it is recognized that under the proper circumstances the Government may be estopped. See *United States v. Gross,* 451 F.2d 1355 (CA 7, 1971); 2 Davis, *Administrative Law Treatise,* Sec. 1703 and 1704 (1958 and 1970 Supp.). The Court in the *Gross* case, states at page 1358 that:

"In most of those cases holding the government to be estopped, the facts upon which the private party relied to his detriment were addressed or communicated directly to him by a government official."

However, the language in several other cases seems to restrict generally the application of estoppel to the Government. For example, in the case of *Udall v. Oelschlaeger,* 389 F.2d 974 (CADC, 1968), the Court expressed at page 977 that the:

. . . "Government is never disabled from protecting the public interest by reason of the past mistakes of its agents."

Another case which follows this latter pattern is that of *United States v. E. W. Savage & Son, Inc.,* 343 F.Supp. 123 (D.C.S.D. 1972) affirmed 475 F.2d 305; wherein the Court states at page 126 that:

"The United States cannot be estopped by the act of its agent even if grounds normally sufficient for estoppel in a suit between private parties are present."

The First Circuit Court seems to follow this restrictive pattern in the case of *Peignand v. Immigration and Naturalization Service,* 440 F.2d 757 (CA 1, 1971), where the Court states at page 761:

"The doctrine of estoppel, *assuming it can operate at all against the government,* is not applicable here. The respondent did not lead 'petitioner to any course of action which he would not otherwise have taken, or [lead] him to change his situation in any way, whether to his detriment or otherwise.'" (Citations omitted) (Emphasis added).

Defendants heavily rely on the following allegations to support their contention that estoppel applies to the Government in the present case.

(1) The Commissioner is attempting to correct the mistake of interpretation under the law of the Dominican Republic or foreign law.[20]

(2) The Commissioner arbitrarily abused his powers.

(3) Twenty years have passed from the time the alleged taxes were due and it would be unreasonable to collect them now.

Although Defendants cite the case of *Schuster v. C.I.R.,* 312 F.2d 311 (CA 9, 1962), this case mainly supports a contrary conclusion to that favoring their position. We find that the Court states, at page 317:

"We recognize the force of the proposition that estoppel should be applied against the Government with utmost caution and restraint, for it is not a happy

---

**20.** As we understand this allegation, Defendants are raising the fact that in the initial *Benítez Rexach* case, 185 F.Supp. 465, the Government argued against the theory that Lucienne under the Dominican Republic Law had a one half vested interest on Benítez Rexach's earnings in the Dominican Republic and thus Benítez Rexach could only be taxed on his half of the earnings. In this case the Government is resting its case on the conclusion reached by the Court in 185 F.Supp. 465 as to the fact that Lucienne had such a vested interest and since the theory of the Government is that she never lost her citizenship, she must be taxed for such vested interest. It is Defendants' allegation that Plaintiff is estopped from taking such a position since they initially opposed it.

occasion when the Government's hands, performing duties in behalf of the public, are tied by the acts and conduct of particular officials in their relations with particular individuals. Estoppel has been applied against the Commissioner in limited situations, but they have usually arisen where the Commissioner's act involved matters of a purely administrative nature. Indeed the tendency against Government estoppel is particularly strong where the official's conduct involves questions of essentially legislative significance, as where he conveys a false impression of the laws of the country. Obviously, Congress's legislative authority should not be readily subordinated to the action of a wayward or unknowledgeable administrative official. Accordingly, the general proposition has been that the estoppel doctrine is inapplicable to prevent the Commissioner from correcting a mistake of law."

"But we regard this proposition as one of general application, not as embracing the concept that the Commissioner might always correct a legal mistake regardless of the injustice which will result. It is conceivable that a person might sustain such a profound and unconscionable injury in reliance on the Commissioner's action as to require, in accordance with any sense of justice and fair play, that the Commissioner not be allowed to inflict the injury. It is to be emphasized that such situations must necessarily be rare, for the policy in favor of an efficient collection of the public revenue outweighs the policy of the estoppel doctrine in its usual and customary context." (Citations omitted).

The application of the estoppel doctrine to tax cases has been analyzed in the case of *In Re Petition of La Voie,* 349 F.Supp. 68, at page 74, (D.C.St.Thom., 1972), wherein the Court states that:

"Estoppel is invoked frequently and with little success in tax cases, where the taxpayer seeks to hold the Internal Revenue Service to an early ruling. However, in most cases a reversal of opinion does not seem unjust; the taxpayer is simply called upon for sums which should have been paid all along. And where the taxpayer has changed his location or procedures in reliance on the earlier ruling, it may still be argued that the public interest in maintenance of the fisc overbears the individual interests involved." (Citations omitted).

A similar interpretation on the applicability of estoppel is found in the case of *Simmons v. United States,* 334 F.Supp. 853 (DC WD Tenn.1971), wherein the Court set forth at page 858 that:

"It is generally held that the United States of America is not estopped except by authority of statute. At best, it may be said for Plaintiff that equitable estoppel against the sovereign will be invoked only under very exceptional circumstances." (Citations omitted).

■ Based on the foregoing it is our opinion that estoppel is not applicable to the present situation. From the record it appears that no false representation or inducement were made to the Defendants. In fact any interpretation as to the Dominican Law was introduced initially by Rexach Benítez as a defense in the case of *U. S. v. Benítez Rexach,* 185 F.Supp. 465. Thus, Defendants were not led into error by any of Plaintiffs' actions as regard the 1944–1949 period.

The computation of Lucienne's tax liability for the fiscal years 1944–1949 is to be effectuated pursuant to the formula stipulated by the parties and which is on file.

We must now discuss other consequences of this tax liability.

■ Not only did the income earned by the Defendant Benítez Rexach in the Dominican Republic give rise to his business properties in that country, but the income which he earned in the Dominican Republic was reinvested, among other things, in the Escambron Development Company which holds title to the Normandie Hotel which is situated in Puerto Rico. Said property is subject to Lucienne's property rights. Defendant Benítez Rexach has admitted that

he did not turn over to Lucienne the one half vested community property interest in the income he earned in the Dominican Republic, but rather he only furnished her adequate support and retained her vested one-half community property interest. Since the tax liabilities alleged herein are computed as a percentage of Lucienne's vested one half community property interest in her husband's income, her said one half vested interest as retained by Benítez Rexach is necessarily greater than the tax liabilities computed on said one half vested interest.

When Lucienne died on January 18, 1968, Defendant María Benítez Rexach de Andreu as the executrix of her estate, was named as a Defendant in this suit. By terms of the will left by Lucienne all her estate was left to the Defendant Benítez Rexach.

Lucienne D'Hotelle de Benítez Rexach died holding legal title to a certain tract of real property situated in Bayamón, Puerto Rico in which Benítez Rexach also claims a one-half interest.

 As the administrator of the conjugal community Benítez Rexach was authorized to retain and administer all the property of the said conjugal community, including the vested one-half community property interest of Lucienne in the income Benítez Rexach earned in the Dominican Republic during the years 1944 through 1949, inclusive. 31 L.P.R.A. Sec. 3671; *Pérez v. Hawayeck,* 69 P.R.R. 46 (1948). This is particularly so since as previously stated Benítez Rexach has admitted that he retained possession of the vested one-half community property interest of Lucienne in the income he earned in the Dominican Republic during the years 1944 through 1958, providing her only with support.

The federal income tax assessments which were made against Lucienne on August 13, 1964, for the years 1944 through 1949, inclusive, are secured by tax liens which arose on the dates of the assessments, and which tax liens encumber all property and rights to property of Luci-

enne, including her rights to the vested one-half community property interests in the said income of her husband, which community property interests have at all times relevant hereto been held by Benítez Rexach. See Section 6321 of the Internal Revenue Code of 1954, appearing at 26 U.S.C.A. § 6321. Accordingly, the Defendant Benítez Rexach, as the holder of property on which the United States claims tax liens, is liable to the United States for the amount due on said tax liens or for the amount or value of the property so held by him and encumbered by the said tax liens, whichever amount is the lesser.

 Upon the death of Lucienne, Benítez Rexach as the administrator of the said conjugal community, was accountable for her vested one-half community property interest to the estate of Lucienne, which estate is being administered here in Puerto Rico. See 31 L.P.R.A. Secs. 3621, 3681, 3692, 3694 and 3697. However, the said vested one-half community property interest in Benítez Rexach's income earned in the Dominican Republic during the years 1944 through 1949 has not been turned over to the estate of Lucienne, but rather has been retained by him under claims of her last will and testament being probated in Puerto Rico, which leaves all her estate to him. Such a retention by Defendant Benítez Rexach renders him liable to the United States as a transferee at law, 31 L.P.R.A. Sec. 2785; *United States v. Bess,* 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958); *Commissioner v. Stearn,* 357 U.S. 39, 78 S.Ct. 1047, 2 L.Ed.2d 1126 (1958); and further he is liable to the United States for a tortious conversion of its tax liens in that he is holding property as his own which is subject to the federal tax liens securing the tax liabilities assessed against Lucienne. *United States v. Allen,* 207 F.Supp. 545 (D.C.E.D.Wash., 1962); *Nomellini Construction Co. v. United States,* 328 F.Supp. 1281 (DC ED Cal.1971); *United States v. Matthews,* 244 F.2d 626 (CA 9, 1957); *George Adams & Frederick Co. v. South Omaha National Bank,* 123 F. 641 (CA 8, 1903);

*United States v. Pete Brown Enterprises, Inc.,* 328 F.Supp. 600 (DC ND Miss., 1971); *Exeter Company v. Holland Corp.,* 172 Wash. 323, 23 P.2d 864 (1933); *American State Bank v. Sullivan,* 134 Wash. 300, 235 P.2d 815. The Defendant Benítez Rexach's said liability as a transferee and for tortious conversion of lien is for the amount of said liabilities of Lucienne or the amount of the transferred and converted property, whichever amount is the lesser.

The United States is entitled to a judgement against María Benítez Rexach de Andreu as executrix of the estate of Lucienne for the amount of income taxes due from Lucienne for the years 1944 through 1949, computed according to the formula agreed upon by the parties in the stipulation previously referred to herein. Furthermore, the United States is entitled to a judgement against the Defendant Benítez Rexach both in his individual capacity because of his liability as a transferee of property subject to federal tax liens, and on account of his tortious conversion of federal tax liens, and in his capacity as the administrator of the aforesaid conjugal community in that he failed to pay the aforesaid federal tax liabilities which were a debt of the aforesaid conjugal community. Since the aforesaid tax liabilities were computed as a percentage of Lucienne's vested one-half community property interest in the income earned by her husband in the Dominican Republic during the years 1944 through 1949, the aforesaid tax liabilities are necessarily less than the amount of her community property interest which are subject to the federal tax liens and which have been improperly retained by the Defendant Benítez Rexach. Therefore, the judgment to be entered against Defendant Benítez Rexach both in his individual capacity for tortious conversion and as a transferee, and in his capacity as administrator of the said conjugal community is to be in the lesser amount of the tax liabilities due from Lucienne computed according to the formula agreed upon by the parties. The United States is also entitled to a judgement against the Defendant Benítez Rexach as he is holding property which belongs to the estate of Lucienne, to wit, Lucienne's vested one-half community property interest in the income earned by her husband, Benítez Rexach, in the Dominican Republic during the years 1944 through 1949, and which community property interest is subject to the tax liens outstanding against the decedent, Lucienne. Since, as aforesaid, the said tax liens secure liabilities which are lesser in amount than the value of said one-half community property interests, the United States is entitled to a judgement against Benítez Rexach in the amount of the tax liabilities due from Lucienne computed according to the formula agreed upon by the parties in the stipulation.

The United States may foreclose its tax liens which secure the tax liabilities due from Lucienne for the years 1944 through 1949, against the real property described in the complaint herein titled in the name of Lucienne and situated in Bayamón, Puerto Rico, and also its liens against the stock of the Escambrón Development Company which owns the Normandie Hotel.

JUDGEMENT shall be entered in accordance with this Opinion.

IT IS SO ORDERED.